**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| NETWORK TALLAHASSEE, INC., individually and on behalf of all others similarly situated,<br><br>                    Plaintiff<br><br>v.<br><br>EMBARQ CORPORATION et. al.;<br><br>Defendants. | ) Case No. 4:10-CV-00038-RH-<br>) WCS<br>)<br>) <u>CLASS ACTION</u><br>)<br>) **PLAINTIFF'S**<br>) **MEMORANDUM OF POINTS**<br>) **AND AUTHORITIES IN**<br>) **SUPPORT OF ITS MOTION**<br>) **FOR CLASS CERTIFICATION**<br>)<br>) |

---

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff Network Tallahassee, Inc. ("Plaintiff" or "Network Tallahassee") asserts claims for breach of contract, for money had and received, and for violation of the Communications Act of 1934, as amended, 47 U.S.C. § 203, seeking for itself and all others similarly situated money damages, restitution, and any other remedies deemed just and equitable by this Court, resulting from the improper calculation and assessment of late payment charges in excess of those provided for by the express terms of applicable federal tariffs, Embarq's Interstate Service Guide, and Commercial Service Agreements for interstate access and information services, by Defendants Embarq Management Company ("Embarq Management"), Embarq Florida, Inc. ("Embarq Florida), Embarq Corporation

("Embarq Corp."),[1] CenturyTel, Inc. ("CenturyTel" or "CenturyLink"), and Sprint Nextel
Corporation ("Sprint"), and for overcharges resulting from Embarq's failure to make
available its Asynchronous Transfer Mode ("ATM") service at lower rates as provided for
in the form DSL Commercial Service Agreements.

This case arises from Defendants' promises to calculate and assess late payment
charges for the provision of services relating to internet access at a "lesser of" rate, when in
fact they uniformly and systematically assessed, and continue to assess, late payment
charges at a rate greater than that permitted by tariff or contract.  The documents governing
late payment charges mandate that two formulae be applied to a balance owing in order to
calculate the appropriate charge and that the formula resulting in the lesser charge be
utilized when a late payment charge is assessed. Defendants' "Customer Records and
Billing" system ("CRB") and "Customer Access Support System" ("CASS"), operated and
controlled by Embarq Management, disregard the "lesser of" distinction and systematically
calculates late payment charges by applying the formula resulting in the greater charge, or
by applying the inapplicable higher intrastate charge.  Defendants' conduct, directed
uniformly to Plaintiff and the class, resulted in payments of  at least hundreds of thousands
of dollars in improper late payment charges.

In addition, Embarq's form DSL Commercial Service Agreements require resellers
of wholesale DSL to purchase a service known as ATM.  The form DSL contracts obligate
Embarq to provide the ATM service at the pricing set forth in its intrastate, or "General
Exchange," tariff.  Embarq breached the terms of the form DSL Commercial Service
Agreements by failing to offer the ATM service at the less expensive intrastate rate; rather,
it instituted pricing for the ATM service at the higher rates contained in its Interstate Service

---

[1] When discussing the combined Embarq entities, Plaintiff hereinafter refers to them
collectively as "Embarq."

Guide.

Thus Plaintiff moves now for an order, pursuant to Federal Rule of Civil Procedure 23, certifying the following class:

> All entities who purchased from Embarq, Interstate Access Service(s) and/or Information Service(s), including: Frame Relay Services, ATM Services, Local Area Network Services, Ethernet-Based Services, Video Transmission Services, Optical Network Services, Wave-Based Services, wholesale DSL services, Bundled Service(s), or any special access line that carries interstate traffic where the interstate traffic is more than ten percent (10%) of the total carried on the special access line, pursuant to FCC Tariff, Embarq's Interstate Service Guide, or a contractual agreement containing a provision for the assessment of late paymentcharges calculated at the lesser of:

> (a)   the total amount due times the highest rate (in decimal value) which may be levied by law for commercial transactions, compounded daily for the number of days from the payment date, including the date the customer actually makes the payment to Defendants; or

> (b)   the total amount multiplied by a factor of 0.000329 times the number of days which occurred between the payment due date and (including) the date payment is actually made to Defendants.

> Excluded from the class are Defendants, their parents, subsidiaries, and affiliates.

## FACTUAL BACKGROUND

Network Tallahassee, an Internet Service Provider ("ISP"), is one of many resellers information services that purchases DSL and other interstate access services and information services from Defendants to provide its customers access to the Internet. *See* Second Amended Complaint ("SAC"), at ¶ 33; Declaration of Darrel Harvey in Support of Plaintiff's Motion for Class Certification ("Harvey Decl."), ¶ 2. Network Tallahassee provides Internet services to consumers in four regions of Florida. *See* SAC at ¶ 34. The Internet services provided by Network Tallahassee are interstate services as defined by order of the FCC. *See id; see also id.* at ¶ 35 (quoting FCC Order, *In the Matter of*

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 - Intercarrier Compensation for ISP-Bound Traffic,* 16 F.C.C.R. 9151 (2001); "[T]raffic bound for information service providers (including Internet access traffic) often has an interstate component . . . [t]hus, ISP traffic is properly classified as interstate").

Embarq Corporation owns and controls all of the outstanding stock of its local operating companies, including Embarq Florida. *See* SAC at ¶ 12. Embarq's local operating companies ("LOCs") carry out the business of Embarq in 18 states. *See* SAC at ¶ 12. Though Embarq carries out its telecommunications business through its local operating company subsidiaries, Embarq Management operates as a central, common resource providing management and information services, including billing services, to the local operating companies. *See id.* at ¶ 15. Embarq Management is responsible for much of the day-to-day operations of Embarq's local operating companies.

Billing activities for Embarq's LOCs are processed centrally though computerized systems run by Embarq Management through its CRB and CASS billing systems. *See id.* at ¶ 16. *See also* Declaration of Robert S. Green in Support of Plaintiff's Motion for Class Certification ("Green Decl."), Ex. D (Defendants' Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 1). The CRB system utilized by Embarq Management is the same for all Embarq LOCs. *See id. See also Stammco, LLC v. United Telephone Co. of Ohio,* Case No. F-07-024, 2008 WL 2939455, at *2 (Ohio App. 6 Dist. Aug 1, 2008).[2] Embarq Management prepares and sends all bills or invoices for the services at issue in this case. *See, e.g.,* Green Decl., Ex. E (Services Contract between Embarq

---

[2] *Stammco,* at *2 ("Billing activities for [defendant], and for all of the other local telephone companies that are part of the Sprint network, are processed centrally through a system managed by what is now known as Embarq Management Company. The process of billing for the services provided by these LOCs is the same for all subsidiaries of Sprint. This process was and is managed solely through a system of computerized procedures, and they have not changed during the relevant time period.").

Management and Embarq Florida at § 2(c)); Ex. F (Services Contract between Embarq Management and United Tel. Co. of the N'West at § 2(c)).

Defendants' DSL wholesale offering provides a virtual private line connection from an end-user's designated premises to the point of connection on Embarq's network, allowing ISPs such as Network Tallahassee to provide DSL service to such end-users. *See* SAC at ¶ 36. In addition, Defendants provide such services directly to some end-users, whose accounts are similarly governed by the late payment fee provisions as contained in Defendants' tariffs and contracts. *See id.*

Network Tallahassee purchased various interstate access and information services, including wholesale DSL, from Sprint beginning in approximately 2000, and after Sprint spun-off of its Local Telecommunications Division in 2006, from Embarq. *See id.* at ¶ 37. *See also* Harvey Decl., Ex F (2000 DSL contract). The terms and conditions of Network Tallahassee's purchase of interstate access services were initially governed by an interstate tariff filed by Sprint (Sprint FCC Tariff No. 3), and thereafter by an interstate tariff filed by Embarq Corporation and Embarq Management on behalf of its LOCs (Embarq FCC Tariff No. 1). *See* Green Decl., Ex. G (excerpts from Sprint FCC Tariff No. 3); Ex. H (excerpts from Embarq FCC Tariff No. 1).

Beginning in approximately 2006, Embarq's wholesale DSL offering ceased to be governed by federal tariff. Thus, Network Tallahassee entered into a series of form contracts—the DSL Commercial Service Agreements—with Embarq for the provision of wholesale DSL services. *See* SAC at ¶ 39. *See also* Harvey Decl., Ex.'s G, H, A (2006, 2008, and 2009 DSL Commercial Service Agreements). All of Embarq's customers who purchased this service offering entered into the same form contracts and each DSL contract contains identical late fee provisions. *See* Green Decl., Ex. C (Defs.' Supplemental Answers to Pltf.'s First Set of Interrogatories, Resp. No. 4 ("During the [period from 2006 to 2009, inclusive] Commercial DSL customers who had a DSL agreement were billed the same as

Plaintiff for late payment charges pursuant to the terms of their individual contracts.")).

Although Embarq maintains purportedly separate local operating company subsidiaries in

each of the states where it conducts business, all of the DSL contracts include as parties each

of the local operating company subsidiaries. *See, e.g.,* Harvey Decl. Ex. A (DSL

Commercial Service Agreement and Exhibit A thereto).

The terms and conditions for other interstate access and information services offered

by Defendants, including Dedicated IP, ISDN, T-1 Internet Access, Frame Relay, ATM, and

Ethernet, were and are similarly governed by federal tariff, Embarq's Interstate Service

Guide, or contract. *See* SAC at ¶ 40. Each of these governing documents contains identical

late payment fee provisions. *See id.* at ¶ 42.

More specifically, Sprint's FCC Tariff No. 3, Embarq's FCC Tariff No. 1, and

Embarq's Interstate Service Guide separately provide for the assessment of late payment

charges at Section 2.4.1(B)(3)(b)(1) and (II), and each states in pertinent part:

> The late payment interest shall be the portion of the payment
> not received by the payment date times an interest factor. The
> interest factor shall be the lesser of:
> (I)      the highest rate (in decimal value) which may be levied by
> law for commercial transactions, compounded daily for the number
> of days from the payment date to and including the date that the
> customer actually makes the payment to the Telephone Company, or
> (II)      0.000329 per day, compounded daily for the number of days
> from the payment date to and including the date that the customer actually
> makes the payment to the Telephone Company.

See Green Decl., Ex.'s I, J, and K (late payment fee provisions from Sprint FCC Tariff No.

3, Embarq FCC Tariff No. 1, and Embarq's Interstate Service Guide, respectively); SAC at ¶

43.

In identical fashion, Defendants' DSL Commercial Service Agreements provide for

the assessment of late payment charges at Section 4.7. Section 4.7 states in pertinent part:

> 4.7.      Embarq will assess late payment charges to Customer until the amount
> due is paid in full. Such late payment charges will be calculated using a

6

rate equal to the lesser of:

4.7.1.  The total amount due times the highest rate (in decimal value) which may be levied by law or for commercial transactions, compounded daily for the number of days from the payment date, including the date the customer actually makes the payment to Embarq; or

4.7.2.  The total amount due multiplied by a factor of 0.000329 times the number of days which occurred between the payment due date and (including) the date Customer actually makes the payment to Embarq.

*See* Harvey Decl., Ex. A (2009 DSL Commercial Service Agreement); SAC at ¶ 44.

Embarq Management's centralized billing systems use the same formula for calculating late payment charges to all purchasers of Embarq's non-DSL services as well as Embarq's DSL Services. *See* Green Decl., Ex. C (Defs.' Supp. Answers, Resp. No. 4 ("All non-DSL accounts held by the Plaintiff that had a late payment charge were calculated in accordance with the guidelines outlined in the General Exchange Tariff and were calculated the same as other Interstate Access and/or Information Service Accounts. During the same period, Commercial DSL customers who had a DSL agreement were billed the same as Plaintiff for late payment charges pursuant to the terms of their individual contracts.")). At all times relevant to this litigation, Embarq's billing systems utilized a formula that was not in conformity with the late payment charge formula set forth in the DSL Commercial Service Agreements. *See, e.g.,* Harvey Decl., at ¶ 7, Ex. B (Embarq resolution letters acknowledging that late payment charges were not assessed in conformity with contract language). In most cases, the formula applied by Embarq overstated the amount of late payment charges applicable to the provision of DSL services.

In June 2009, Embarq received a written complaint from Network Tallahassee questioning certain late payment charges Embarq assessed against Network Tallahassee accounts. *See* Harvey Decl., Ex. B (June 2009 letter from Network Tallahassee to Embarq); SAC ¶ 52. Over the course of the ensuing months, Network Tallahassee and Embarq

representatives attempted to resolve the late payment issue, with Embarq ultimately acknowledging its improper calculation of late payment charges on Network Tallahassee's DSL account. However, the parties were unable to agree with regard to the time period for which refunds are owed. *See* Harvey Decl., Ex. C (Embarq resolution letters acknowledging overcharges; "late pay charges have been billed at a higher rate than the rate referenced in the contract"); SAC ¶¶ 52, 54. Additionally, Defendants refused to acknowledge the incorrect calculations and assessments of late payment charges applicable to Network Tallahassee's non-DSL accounts, such accounts being governed by identical late payment fee provisions.

Embarq's DSL Commercial Service Agreements require every reseller of such services to purchase from Embarq a service known as Asynchronous Transfer Mode or "ATM." *See* Harvey Decl., at ¶ 9, Ex. A (2009 DSL Commerical Service Agreement at Schedule 1, ¶ 5). The DSL Commercial Service Agreements obligate Embarq to provide the ATM service at the pricing level set forth in its intrastate tariffs—the General Exchange Tariffs—which represents a less expensive pricing alternative for the same product offered under Embarq's Interstate Service Guide. *See* Harvey Decl., at ¶ 9

Embarq breached the form DSL Commercial Service Agreements by failing to make the ATM service available at the lower price set forth in the General Exchange Tariff. *See* SAC, ¶¶ 63-66. Indeed, when Plaintiff inquired about the availability of the ATM service at the less expensive intrastate rates, Embarq replied that it only offered ATM service under its interstate tariffs. *See id.; see also* Harvey Decl., Ex. E (December 2009 letter stating that CenturyLink does not have an intrastate ATM offering). Embarq's denial was false. *See* Harvey Decl., ¶ 10. However, Embarq has refused to refund any of the overcharges resulting from Embarq charging the higher interstate rate for a service that it was contractually obligated to provide to Plaintiff, and members of the class, at the lower intrastate rate.

## LEGAL STANDARDS

An action may be maintained as a class action if all four prerequisites of Rule 23(a) are met and the requirements of one of the three subsections of Rule 23(b) also are satisfied. *See Klay v. Humana, Inc.,* 382 F.3d 1241, 1250 (11th Cir. 2004). Rule 23(a) mandates that the proposed class meet the requirements of numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. Pro. 23(a). Here, Plaintiff seeks to certify the class pursuant to Rule 23(b) subsections (2) and (3) in that Defendants acted, or refused to act, on grounds generally applicable to the class as a whole, such that final injunctive is appropriate; and that common issues of fact and law predominate over any individual issues, such that the class action device is the superior means by which to resolve this litigation. *See* Fed. R. Civ. Proc. 23(b)(2), (3).

The Court has broad discretion when considering whether to certify a class. The Court may not determine the merits of Plaintiff's claims at the class certification stage, though it may be necessary for the Court to look beyond the pleadings to answer the certification question. *See Singer v. AT&T Corp.,* 185 F.R.D. 681, 686 (S.D. Fla. 1998). In addition, "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Id.*

## ARGUMENT

Plaintiff satisfies each of the required elements of Rule 23. The class is sufficiently numerous and geographically dispersed that joinder is impracticable. Numerous issues of law and fact are common to all members of the class and Plaintiff's claims are typical of those of the class. Plaintiff, who has retained counsel highly experienced in complex class action litigation, is an adequate class representative who will fairly represent the interests of the class. With regard to Rule 23(b)(3), the common issues of fact and law predominate over any individual issues, rendering the class action device the superior means for adjudicating this matter. In addition, Defendants acted, or refused to act, on grounds

generally applicable to the class pursuant to Rule 23(b)(2). .

## I.     The Class is Sufficiently Numerous

Rule 23 requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). Plaintiff need not know the precise number of class members and need only provide a reasonable estimate of the size of the proposed class. *See Ruderman v. Washington National Ins. Co.*, 263 F.R.D. 670, 678-79 (S.D. Fla. 2010). In the Eleventh Circuit, "[g]enerally, less than twenty-one is inadequate, more than forty adequate." *Id., quoting Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Numerosity may be satisfied where class members are geographically dispersed. *See, e.g., County of Monroe, FL v. Priceline.com, Inc.*, 265 F.R.D. 659, 667 (S.D. Fla. 2010) ("The class members' geographic dispersion also militates in favor of a finding that joinder is impracticable . . . ."). Indeed, "[e]ven a mere inconvenience in being able to join all of the [proposed class members] makes class litigation desirable." *Singer*, 185 F.R.D. at 687.

Here, the class is sufficiently numerous and geographically dispersed such that Rule 23(a)(1)'s numerosity requirement is satisfied. Embarq identified 136 total commercial DSL nationwide accounts for the period 2006 through 2009, 112 of which are actual unique customers. *See* Green Decl., Ex. C (Defs.' Supp. Answers, Resp. No. 6). Joinder would be impracticable.

## II.     Plaintiff's Claims are Typical of the Claims of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." *See* Fed. R. Civ. Pro. 23(a)(3). "Typicality is satisfied where the named plaintiffs' claims 'arise from the same event or pattern or practice and are based on the same legal theory' as the claims of the class." *Ruderman*, 263 F.R.D. at 681, *quoting Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert denied*, 470 U.S. 1004 (1985). "Like commonality, typicality is not a demanding test." *County of Monroe*, 265 F.R.D. at 668. "[A] strong similarity of legal theories will

satisfy the typicality requirement despite substantial factual differences." *Singer,* 185 F.R.D. at 689. *See also Williams v. Mohawk Indus.,* 568 F.3d at 1350, 1357 (11th Cir. 2009) ("A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).") (citation omitted).

Here, Plaintiff's claims are typical of those of the class. Plaintiff and absent class members all purchased interstate access and/or information services from Defendants pursuant to the same governing documents and were assessed improper late payment charges in contravention of the express terms of those documents. The purchase of those services was and is governed either by tariff, Embarq's Interstate Service Guide, or form contracts, all of which contain virtually identical late payment fee provisions, the breach of which gives rise to Plaintiff's claims for breach of contract and violation of the Communications Act, as amended, 47 U.S.C. § 203. Similarly, Plaintiff's breach of contract claim as it relates to the provision of ATM services is typical of the claims of the class. As Embarq uses a form contract for all of its DSL services, all wholesale purchasers of such services have the same contract term that required Embarq to provide alternative pricing for the ATM service. Plaintiff's claim for money had and received is typical of that of the class because it derives from the same uniform course of conduct making it unjust for Embarq Mangement and/or the parent corporation Defendants to retain improperly calculated late payment charges paid by Plaintiff and members of the class. Thus, Plaintiff's claims are based on the same legal theories. In addition, Plaintiff's claims are typical of the class' claims because Plaintiff's bills containing the improperly calculated late payment charges were uniformly generated by Embarq Management and Plaintiff remitted payment, including the improperly calculated late payment charges, to Embarq, in a manner controlled and directed by Embarq Management, as did each member of the proposed class. *See* Green Decl., Ex. C (Defs.' Supp. Answers, Resp. No. 1 ("Payments are mailed to lockboxes operated by BankCheck, not by any of Defendant's personnel.")). Thus, Plaintiff

satisfies the typicality requirement because proof of its claims will establish Defendants' liability to the class.

### III.   Plaintiff Will Represent Adequately the Interests of the Class

Rule 23(a)'s final requirement is that "the representative parties will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. Proc. 23(a)(4).  This requirement applies equally to the class representative and its choice of counsel.  *See Ruderman*, 263 F.R.D. at 681.  "The adequacy inquiry examines '(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *County of Monroe*, 265 F.R.D. at 668, *quoting Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003).

Plaintiff is an adequate class representative.  Its interests are completely congruent with the interests of the class and no conflicts of interest between Plaintiff and absent class members exist.  As demonstrated by Plaintiff's conduct in this matter to date, it will continue to adequately prosecute this action by meeting its discovery obligations and monitoring the conduct of its choice of counsel.  What is more, Plaintiff's counsel is qualified, highly experienced in complex class litigation, and able to vigorously litigate this action. *See* Green Decl., Ex.'s A, B (firm resumes).

### IV.   Resolution of Plaintiff's Claims Involves Common Issues of Fact and Law

Commonality demands that there be "questions of law or fact common to the class." *See* Fed. R. Civ. Proc. 23(a)(2).  "This is a relatively light burden that does not require that all the questions of law or fact raised by the dispute be common or that the questions of law or fact predominate over individualized issues." *See County of Monroe*, 265 F.R.D. at 667 (internal quotations and citations omitted).  "Commonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams,* 568 F.3d at 1355.  "Commonality may be established where there are allegations

of common conduct or standardized conduct by the defendant directed towards members of the class." *Sher v. Raytheon Co.,* 261 F.R.D. 651, 663 (M.D. Fla. 2009).

Myriad issues of law and fact, the resolution of which will affect each potential class member, are common to the class, particularly where, as here, Plaintiff's claims arise from Defendants' standardized billing practices. Allegations such as these typically lead to a finding of commonality. *See Singer,* 185 F.R.D. at 688 (plaintiff "alleges that this action is the result of AT&T's standardized billing practices. Where such allegations are made, common questions are usually found.").

Here, the overarching issue of whether Defendants breached their contractual agreements to class members by (1) over-billing as a result of improperly calculating late payment charges, and (2) failing to offer the ATM service at the less expensive intrastate rate, as it is obligated to do by the terms of its form DSL contracts, rather than at the interstate rate, are questions of fact and law that are common to the class. *See* SAC at ¶ 30(b)(i), 66. Similarly, whether class members have a contractual relationship with Embarq Management, Embarq Corporation, and CenturyTel, Inc., and the underlying legal questions relating to theories of agency attendant to this issue, are questions common to the class.[3] A

---

[3] *See* SAC at ¶¶ 30 (b)(viii-xii) (listing common questions of: whether CenturyTel, Inc. exercises control over Embarq Corporation, such that Embarq Corporation is the agent through which CenturyTel, Inc. conducts its telecommunications business within Embarq's local operating territories (*see id.* at ¶ 30(b)(viii)); whether Embarq Corporation exercises control over Embarq Management such that Embarq Management is an agent through which Embarq Corporation conducts business within Embarq's local operating territories (*see id.* at ¶ 30(b)(ix)); whether Embarq Management exercises control over the Embarq local operating company subsidiaries, such that the local operating company subsidiaries are agents through which Embarq Management conducts business within Embarq's local operating territories (*see id.* at ¶ 30(b)(x)); whether Embarq's local operating company subsidiaries function as agents of Embarq Management, Embarq Corporation, and CenturyTel, Inc. within their respective local territories to achieve the purposes of Embarq Corporation and CenturyTel, Inc. (*see id.* at ¶ 30(b)(xi)); whether Sprint's local operating telephone companies functioned as agents of Sprint within their respective local territories to achieve the business purposes of Sprint (*see id.* at ¶ 30(b)(xii))).

related issue touching upon Defendants' liability is whether the provision of all class members' interstate services is governed by form contracts, the Interstate Service Guide, or Defendants' federal tariff, and whether all of these governing documents contain an identical late payment fee provision requiring Defendants to calculate late payment charges based on a standard formula. *See id.* at ¶ 30(b)(ii).  What is more, whether all class members suffered the same type of injury as a result of a common course of conduct by Defendants—the uniform failures (1) to apply the correct formula when calculating and assessing late payment charges or applying the inapplicable (and higher) intrastate rate and (2) to offer ATM service at the intrastate rate rather than at the interstate rate as required by the DSL contracts—are questions common to all class members. *See, e.g., County of Monroe,* 265 F.R.D. at 667 (finding commonality where all class members enacted substantially identical tax ordinances under the authority of the Enabling Act that, therefore, imposed the same duties for collecting and remitting the tax and "all class members allegedly suffer the same type of injury as a result of a course of conduct by the Defendants . . . that is common to all class members").

In addition to the overarching common questions relating to Defendants' liability, other issues present questions of law and fact are common to all class members.  These issues include:

1.  Whether Embarq Management acts as a central and common resource to Embarq's local operating company subsidiaries by providing centralized and computerized billing services for class members through the programming and utilization of the CRB and CASS systems (*see* SAC at ¶ 30(b)(iii));

2.  Whether Embarq Management generated customer bills and invoices containing late payment charges for services provided to class members (see id. at ¶ 30(b)(iv));

3.  Whether the billing processes employed by Embarq Management through its use of the CRB and CASS billing systems are the same for all class members (see id. at ¶ 30(b)(vi);

4.  The degree to which Embarq Management, Embarq Corporation, and/or CenturyTel, Inc. received and are in possession of class members' payments containing improperly calculated late payment charges (see id. at ¶ 30(b)(v));

5.  Whether Embarq Management, Embarq Corporation, and/or CenturyTel, Inc.'s retention of improperly calculated late payment charges is unjust, such that equity and good conscience require such sums be returned to Plaintiff and the class (*see id.* at ¶ 30(b)(vii)).

Consequently, Rule 23(a)(2)'s commonality requirement is met because there are a significant number of questions of fact and law that are common to the class.

## V.   Common Issues of Fact and Law Predominate Over any Individual Issues

The myriad common issues of law and fact identified above predominate over any individual issues. Common issues predominate where they "have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *See County of Monroe,* 265 F.R.D. at 670 (internal quotations and citation omitted). *See also Williams,* 568 F.3d at 1357 (same). Predominance "does not require a complete absence of individual issues." *Singer,* 185 F.R.D. at 690. Where, as here, the question of liability is common to the class, common questions are held to predominate over individual questions. *See Singer,* 185 F.R.D. at 690, *citing Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 725 (11th Cir. 1987). In short, therefore, Plaintiff satisfies Rule 23(b)(3)'s predominance requirement because proof of Plaintiff's claims will be proof of all class members' claims, such that after resolution of the classwide issues, individualized proofs will not be necessary for class members to prove Defendants' liability as to them. *See, e.g., Klay,* 382 F.3d at 1255. *See also* 7A Wright & Miller, *Federal Practice and Procedure,* § 1778 (2d ed. 1986) ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is justification for handling the dispute on a representative rather than an individual basis.").

The central questions presented in this litigation are:

1)    whether the services represented by Plaintiff's accounts are properly
      characterized as interstate, such that the late payment fee provisions
      contained in Defendants' federal tariff and/or Interstate Service Guide apply
      rather than those contained in the intrastate General Exchange Tariff;

2)    Defendants' ultimate liability for its failure to abide by the express terms of
      its written agreements—i.e., whether Embarq correctly interpreted the
      relevant late payment fee provisions contained in its contracts and tariffs
      when calculating and assessing late payment fees on interstate access and
      information service accounts and whether Embarq failed to provide ATM
      service at the intrastate rate as it was obligated to do by the terms of its form
      DSL contracts; and

3)    whether, as a matter of equity, Defendants should be required to return to
      Plaintiff and the class the monetary amounts improperly collected as late
      payment fees.

All class members' claims against Defendants will succeed or fail based on how these
questions are resolved.

       Each of these central questions is common to all class members and predominates
over any individual issues.  For example, in support of its breach of contract claim, Plaintiff
alleges that, through the operation of the CRB and CASS computerized billing systems,
Defendants, and specifically Embarq Management, acted in a uniform manner as to all class
members by applying the incorrect late payment formula or rate to class members' accounts
when assessing late payment charges on the interstate services at issue.  *See* Green Decl.,
Ex. C (Defs.' Supp. Answers, Resp. No. 4 (same late payment charge formula used to
calculate Plaintiff's late payment charges used for all others purchasing same services)); Ex.
D (Defs.' Answers to Pltf.'s First Set of Interrogatories, Resp. No. 1 (identifying CRB and
CASS billing systems)); Ex. E (Embarq Management/Embarq Florida Services Agreement
at § 2 (regarding information services provided by Embarq Management, including billing
services)).  *See also* Harvey Decl., Ex. D (July 2009 e-mail acknowledging late payment

charge calculation errors related to CRB system); Ex. J ("Embarq Flight Plan" newsletter describing centralized billing operations for wholesale customers through Embarq's Billing Operations department).  Once Plaintiff establishes that Defendants engaged in this conduct, each individual class member's breach of contract claim will be substantially advanced. Given the classwide evidence of Embarq Management's control over the programming and operation of the CRB and CASS billing systems and the computer systems' application of the incorrect late payment charge rate, each individual class member could show that Defendants violated its contractual rights simply by demonstrating that it been assessed a late payment charge during the relevant period.  *See, e.g., Allapattah Services, Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir. 2003) ("Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole.  Whether it breached that obligation was a question common to the class and the issue of liability was appropriately determined on a class-wide basis.").

Plaintiff's breach of contract claim relating to ATM services also is susceptible to classwide proof.  As Embarq uses a form contract for all of its DSL services, all wholesale purchasers of such services have the same contract term that required Embarq to provide alternative pricing for the ATM service.  Once the Court interprets the ATM clause contained in the DSL Commercial Service Agreements, it may apply that interpretation to all of the identical form DSL contracts, again substantially advancing this breach of contract claim. Each individual class member could show that Defendants violated its contractual rights simply by demonstrating that it was charged for the provision of ATM services at the interstate rate.

Plaintiff's claim for money had and received similarly is suitable for classwide adjudication.  *See, e.g., Moss v. Condict,* 154 Fla. 153, 155-56 (1944) (common law count of money had and received constitutes a remedy at law to recover money erroneously received

by a defendant; the remedy is equitable in nature and is founded upon the principle that one should not be unjustly enriched at the expense of another). *See also Equilease Corp. v. Hentz,* 634 F.2d 850, 853 (5th Cir. 1981) (claim for money had and received alternatively referred to as, *inter alia,* one for restitution or unjust enrichment). Thus, the predominant common question as to this claim is whether, as a matter of equity, Defendants should be required to return the erroneously assessed late payment charges collected from Plaintiff and the class. Here, representatives of the parent company Defendants—Embarq Corporation, CenturyTel, Inc., and Sprint Nextel Corporation—did not sign the contracts with their customers. Whether these Defendants may be liable on those contracts by way of agency or principles of equity because they are in actual possession of Plaintiff's and the class' improper late payment charges is a predominant common question. Thus, as Defendants' business practices are the same as to all members of the class, the underlying concern expressed by the Eleventh Circuit with regard to certifying claims for unjust enrichment is not present. *See, e.g., County of Monroe,* 265 F.R.D. at 671. Defendants' uniform conduct towards class members as it relates to the calculation and assessment of late payment charges does not require individualized inquiries into the equities of each class member's dealings with Defendants. *See id.* ("This concern, however, is not present here . . . it is undisputed that Defendants' business operations are the same as to all members of the putative class. Given this fact, it is difficult to conceive of any significant equitable differences between class members . . . [thus plaintiff's] unjust enrichment claim does not preclude a finding of predominance.").

Similarly, issues related to the interpretation of Defendants' form contracts predominate over any individual issues. Each of the form DSL Commercial Service Agreements is substantially identical in content and contains the identical late payment fee provisions, ATM provisioning provisions, and choice of law clauses. *See* Harvey Decl., Exs. A, G, H (Plaintiff's DSL Commercial Service Agreements). In addition, to the extent

Embarq's Interstate Service Guide or FCC Tariff No. 1 govern the calculation and assessment of late payment fees on certain of the interstate service accounts at issue, the terms of the Interstate Service Guide and FCC Tariff No. 1 apply on an equal basis to each class member without regard to its specific state of residence. *See* Green Decl., Exs. G, H. *See also Kleiner v. First Nat. Bank of Atlanta,* 97 F.R.D. 683, 692 (D.C. Ga. 1983) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the class case for treatment as a class action, and breach of contract cases are routinely certified as such."). Here, the Court need only determine once—for all class members—whether the services at issue are interstate services. This inquiry can be resolved by common proof, including an examination of the services offered in Embarq's Interstate Service Guide and federal tariff and by the decisions of the FCC concerning its jurisdiction over services deemed to be interstate. *See, e.g.,* Green Decl., Ex. L (excerpts form Interstate Service Guide, § 7 (Service Descriptions), § 8 (Specialized Network Services)); Ex. M (excerpts from Embarq's FCC Tariff No. 1, Table of Contents at §§ 7, 8, listing Special Access and Specialized Network Services). Assuming for present purposes that the services at issue are interstate in nature, the Court then need only determine once—for all class members—whether Defendants applied the correct formula and other contractual limitations as provided for in the form contracts, Interstate Service Guide, or federal tariff when it assessed late payment charges to Plaintiff's accounts or charged for ATM services at the interstate rate. This inquiry, too, may be resolved by common proof. For example, Plaintiff can demonstrate by common proof that Embarq Management controlled the programming and utilization of the CRB and CASS billing systems and that those systems are programmed to assess the higher late payment charge fee (by applying the incorrect formula or the inapplicable intrastate rate). *See* Green Decl., Ex. C (Defs.' Supp. Answers, Resp. No. 4 (same late payment charge formula applied to Plaintiff's used for all others purchasing same services)); Ex. D (Defs.' Answers to Pltf.'s First Set of Interrogatories, Resp. No. 1

(identifying CRB and CASS billing systems)); Ex. E at § 2 (regarding billing services provided by Embarq Management to local co.'s). *See also* Harvey Decl., Ex. D (July 2009 e-mail acknowledging late payment charge calculation errors related to CRB system) Ex. J ("Embarq Flight Plan" newsletter describing centralized billing operations for wholesale customers through Embarq's Billing Operations department). Defendants' records, therefore, will demonstrate on a classwide basis that interstate access customers were uniformly charged improper late payment fees as a result of the manner in which Embarq Management programmed its computerized billing systems. Thus, once Plaintiff establishes that Defendants—and specifically Embarq Management—operated the billing systems in this manner, class members could simply submit their invoices for a straightforward determination of damages and no further evidence of a breach would be necessary. *See Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978) ("While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance. It will not be necessary to hear evidence on each claim."). Thus, cases such as *Klay v. Humana, Inc.* denying class certification on breach of contract claims are inapposite. *See, e.g., Klay*, 382 F.3d at 1267 (denying class certification where different form contracts used and different defendants committed various acts in breach of their contracts with different types of potential class members).

**V.    The Class Action Device is Superior to Any Other Means of Adjudicating this Matter**

Rule 23(b)(3) requires also that the class action device be "superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. Proc. 23(b)(3). The superiority analysis focuses on the "relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sher*, 261 F.R.D. at 671, *quoting Klay*, 382 F.3d at 1269. Here, the alternative to a

classwide proceeding is for class members to proceed through individual litigation against Defendants—an impractical solution that would unnecessarily burden the court system and prove uneconomical for potential plaintiffs.  Defendants did not treat class members individually when, through utilization of the centralized computerized billing systems, they systematically charged incorrect late payment fees to class members; it does not make sense to adjudicate the legality of that conduct individually, either, especially given the inefficiencies in doing so.

"In many respects, the predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individualized issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Williams*, 568 F.3d at 1358, *citing Klay*, 382 F.3d at 1269.  The Court should consider four factors in determining the superiority issue:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

*See* Fed. R. Civ. Proc. 23(b)(3).

Consideration of each of the four factors militates in favor of certifying the proposed class.  First, absent class members have little interest in individually controlling the prosecution of separate actions, given the size of class members' claims as compared to the expense of litigating complex legal issues against such a large corporate entities like Defendants.  That absent class members lack such interests is evidenced by the dearth of currently pending litigation against these Defendants for the improper calculation and assessment of late payment charges.  For the same reason, Rule 23(b)(3)'s second factor also

militates in favor of proceeding on a classwide basis—Plaintiff is unaware of any litigation concerning the subject matter of this litigation that is currently pending. Third, it is highly desirable that this litigation be concentrated in this Court. Embarq Management, though a foreign corporation, is licensed with the Florida Secretary of State to do business in this state. *See* Green Decl., Ex. N (2009 and 2010 For Profit Corporation Annual Reports, Embarq Management Co.). Indeed, Plaintiff's common proof will demonstrate that Embarq Management not only controls the billing processes and procedures for all class members, but also controls CenturyLink's provision of wholesale services on a nationwide basis, in part through its National Account Service Center located in Leesburg, Florida and other operations in Orlando, Florida. *See* Green Decl., Ex. O (Direct Testimony of Michael Hunsucker on behalf of CenturyLink, Inc. describing the Wholesale Operations Organization); Ex. P (CenturyLink Wholesale Product Guide at 5-6, referring to Wholesale Market Service Center in Florida); Ex. C (Defs.' Supp. Answers, Resp. No. 14 (identifying seven Embarq Management employees involved in the investigation of Plaintiff's complaints)). As such, it is most appropriate to litigate Plaintiff's claims in this Court, once, for the benefit of all class members, given the complex legal and factual issues presented in this case. Doing so would lessen the risk of delay and expense to all parties and the Court, thus preserving judicial efficiency. If the class were not certified, however, the prosecution of separate actions by individual class members would present the potential for inconsistent and contradictory judgments that may establish incompatible standards of conduct for Defendants. In contrast, proceeding on a classwide basis offers the salutary benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

Last, there are no insurmountable difficulties managing this case as a class action. Defendants' common course of conduct as to all class members inexorably leads to the predominance of common questions applicable to the class as a whole. The predominant questions of law and fact may be resolved once, for all class members, based in part on an

examination of Defendants' own records. *See, e.g., Roper,* 578 F.2d at 1115 (finding class action potentially involving 90,000 claims manageable where class members' addresses and itemized account histories could be readily obtained from defendant's computer). No other means of adjudicating this matter exists which is more superior than proceeding by way of a class action.[4] *See, e.g., Ruderman,* 263 F.R.D. at 686 (granting certification to breach of contract and injunctive relief classes and finding superiority requirement met where class claims were predicated on common set of facts and concerned same scheme relating to improperly calculated benefits under insurance policy).

## VI.   Defendants Acted on Grounds Generally Applicable to the Class as a Whole, Making Certification Pursuant to Rule 23(b)(2) Appropriate

Before certifying an injunctive relief class under Rule 23(b)(2), the Court must determine (1) whether Defendant has acted on grounds generally applicable to the class as a whole, and if so, (2) whether declaratory or final injunctive relief is the appropriate and primary remedy. *See* Fed. R. Civ. Proc. 23(b)(2). In addition, when a plaintiff seeks money damages in addition to equitable relief, certification pursuant to Rule 23(b)(2) is appropriate if money damages are "incidental to the requested injunctive or declaratory relief." *See Colomar v. Mercy Hospital, Inc.,* 242 F.R.D. 671, 682 (S.D. Fla. 2007). When class

---

[4] Plaintiff's broad outline of a trial plan for the classwide adjudication of its claims is sufficient at this stage of the litigation. *See, e.g., Sher v. Raytheon Corp.,* 261 F.R.D. at 672 ("Here, unlike *Vega [v. T-Mobile USA, Inc.,* 564 F.3d 1256 (11th Cir. 2009)], trial is not imminent. Plaintiffs' failure to appear at the Hearing with a detailed trial plan, under the timing and circumstances of this case, is not fatal."). Here, this litigation is in its early stages and dispositive motion practice has yet to begin. Defendants' discovery responses have barely begun to produce the necessary information. In addition, there are a few outstanding issues about which, if any, aspects of the case will be tried to a jury. *See, e.g.,* Harvey Decl., Ex. A at ¶ 8.2 (purported jury trial waiver). Once these issues are resolved, the trial plan can be produced. As the issues in this case are clarified going forward, Plaintiff will be in a better position to offer a detailed trial plan that adequately addresses whatever management concerns the Court may have.

members would be automatically entitled to money damages once classwide liability is established, money damages are incidental. *See id.*

As demonstrated, *supra*, Defendants acted, or refused to act, on grounds generally applicable to the class. Embarq Management operates and controls the billing operations for all of Embarq's local operating companies through its utilization of the CRB and CASS billing systems. Those billing systems are uniformly programmed to assess the higher late payment charge fee (by applying the incorrect formula or the inapplicable intrastate rate) on the interstate accounts at issue in this litigation. As a result, Defendants assessed all class members incorrect late payment charges across the board. *See Davis v. Southern Bell Tel. & Tel. Co.,* Case No. 89-2839-CIV-NESBITT , 1993 WL 593999, at *6 (S.D. Fla. Dec. 23, 1993) (certifying class under (b)(2) and (b)(3); with regard to (b)(2) class, finding that defendant acted on grounds generally applicable to the class where defendant "charged *all* of the class members the same . . . prices and thus injured all of the class members in the same way.").

What is more, money damages are incidental to injunctive or declaratory relief. If Plaintiff's allegations in support of its claims for breach of contract and for violation of the Telecommunications Act are correct, Plaintiff and the class would be automatically entitled to damages for the excessive late payment charges they paid. *See Colomar,* 242 F.R.D. at 682. "Nothing in the language of Rule 23 precludes certification of both an injunctive class and a damages class in the same action. In fact, where injunctive relief and damages are both important components of the relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3) in the same action." *Davis,* 1993 WL 593999, at *7 (citing cases).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion for Class Certification.

Dated: October 15, 2010

**GREEN WELLING, P.C.**

By: _[signature]_
Robert S. Green (CA Bar. No. 136183)
*Admitted pro hac vice*
Brian S. Umpierre (CA Bar No. 236399)
*Admitted pro hac vice*

595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile:  (415) 477-6710

**BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP**

By:    /s/ Kathy J. Maus
Kathy J. Maus

3600 Maclay Boulevard, Suite 101
Tallahassee, FL 32312
(FL Bar No. 0896330)
Telephone: (850) 894-4111
Facsimile: (850) 894-4999
kmaus@butlerpappas.com

*Attorneys for Plaintiff*